**The STATE of Ohio, Appellee,**

**v.**

**ROBINSON, Appellant.**

[Cite as *State v. Robinson* (1999), 132 Ohio App.3d 830.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970881.

Decided March 31, 1999.

832

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*Stephen J. Wenke,* for appellant.

HILDEBRANDT, Presiding Judge.

A jury found defendant-appellant Angelo Robinson guilty of murder and possession of cocaine, as well as three firearm specifications accompanying those charges. Robinson appeals his conviction for murder, raising three assignments of error. He does not challenge his drug conviction or the specification pertaining to that charge. In his first assignment, he challenges the trial court's failure to provide a jury instruction on transferred-intent self-defense. In his second and third assignments, he contends, respectively, that the evidence was insufficient to sustain his conviction and that the judgment was against the weight of the evidence.

The following evidence was adduced at trial. Lisha House and Melvin Howell moved into an apartment on Linn Street in Cincinnati, Ohio. A few days after they moved in, a woman House knew as Linda approached her and asked if she could sell crack cocaine from the apartment. (It is unclear whether Linda's surname was Davis or Smith.) House gave her permission, and Linda, accompanied by Robinson, sold cocaine from the apartment that same day. The next day, Linda, carrying cocaine, and Robinson returned. After spending some time alone with Robinson behind the closed door of the apartment's one bedroom, Linda provided House with some cocaine for her personal use and then left the premises, claiming she was not feeling well. Linda told House, who was to help sell the cocaine, that Robinson was going to take care of everything. Before leaving, Linda ensured that Veronica Jackson also would arrive to help sell the cocaine.

House's job in the drug sales was to allow purchasers into the building. Jackson's job was to allow purchasers into the apartment. Robinson was behind the locked bedroom door with the cocaine. Also present in the apartment were Howell and James Gibson.

House was in her position near the outside door, talking to a drug runner, when she noticed five people outside. She told the runner to let them into the building. When the runner returned, he told her that he thought the five men intended to rob them. She ran up the steps and Jackson opened the door. Upon entering the apartment, House yelled at Jackson to close the door because the men had guns. Before Jackson could completely close the door, one of the men stuck his foot between the door and the doorjamb. Before the women were able to close the door, the man pushed the barrel of a gun through the door opening and fired several shots into the apartment. During this time, Robinson never left the locked bedroom.

House described the scene:

"It was total chaos. And this happened in a split second. You have to put yourself, you have to really put yourself in everybody's position. Gunshots are going off. You're telling your friend to get down. She is running around with her head cut off, like a chicken with her head cut off. You trying to tell her to get down. I'm on my stomach in the kitchen. She goes to run anyplace to try and get cover 'cause I know her ears are still ringing too.

"She hits the bedroom door. More shots are fired. And then, I think she might have hit both of those doors at the same time, then more gunshots are fired. And the person that was behind the locked door was hearing the gunshots coming off like that."

House explained that when Jackson tried to get into the bedroom, three shots came from behind the closed bedroom door. After the three shots, Robinson opened the door and asked his companions to call the police.

Jackson died from a bullet wound to her chest, caused by a bullet fired through the bedroom door from the inside. The bullet was fired from the gun found at the scene, a .25–caliber Raven handgun. When the police arrived, they found a bag of crack cocaine and the handgun in the bedroom. In and around the apartment, they also found five spent .22–caliber cartridge casings—obviously from the gun or guns fired by the would-be robbers.

Robinson approached two of the investigating police officers. He told them that, while he was standing outside, he saw five men enter the building, heard shots, and observed the men run away. He provided a description of two of the men. In other words, Robinson at first denied firing the fatal shot. However, he did not take the stand at trial.

## I. Self–Defense

In Robinson's first assignment of error, he argues that the trial court erred in refusing to instruct the jury on transferred self-defense under *State v. Clifton.*[1] Although Robinson has not provided a copy of his proposed jury instruction to this court, the record demonstrates that he submitted the instruction and provided the trial court with a citation to *State v. Clifton.* The proposed instruction would have permitted the jury to acquit Robinson if it believed that he mistakenly or accidentally killed Jackson while acting in self-defense against the intruders. The court declined to give the instruction because the facts of this case did not involve a "crossfire situation" and because the "robbers" did not gain entrance into the apartment.

The issue, as set forth by Robinson, is whether a defendant in a criminal trial is entitled, upon proper request by counsel, to an instruction on transferred-intent self-defense where the jury has been provided both with a transferred-intent instruction and with an instruction on self-defense. Robinson claims that the instruction on transferred intent without an accompanying instruction on transferred-intent self-defense rendered the jury instructions internally inconsistent and warrants reversal on appeal.

However, before we reach the issue of the necessity of the transferred-intent self-defense instruction, we must determine in the first instance whether a self-defense instruction was proper under the facts of this case. If the issue of self-defense was not properly submitted to the jury, the propriety of the transferred-intent self-defense instruction becomes irrelevant. Because we hold that the evidence did not support an instruction on self-defense, we find no prejudicial error in the court's refusal to instruct on the *Clifton* doctrine of transferred-intent self-defense.

This court has previously explained:

"Generally, a trial court is required to give all instructions that are relevant and necessary for a jury to weigh evidence and discharge its' duty as factfinder. *State v. Joy* (1995), 74 Ohio St.3d 178, 181, 657 N.E.2d 503 [505–506]; R.C. 2945.11. The court must give instructions on all issues that are raised by the evidence and that are pertinent, legally correct and not covered by other instructions. See *Joy, supra,* at 181 [657 N.E.2d at 505–506]; *State v. Scott* (1986), 26 Ohio St.3d 92, 101 [26 OBR 79, 87], 497 N.E.2d 55 [63–64].

"When a defendant asserts an affirmative defense, the trial court is obligated to provide an instruction to the jury on that issue only if the evidence adduced at trial is of a nature and quality sufficient to support the defense and to submit the

---

1. *State v. Clifton* (1972), 32 Ohio App.2d 284, 61 O.O.2d 348, 290 N.E.2d 921.

issue to the jury. See *State v. Melchior* (1978), 56 Ohio St.2d 15 [10 O.O.3d 8], 381 N.E.2d 195, paragraph two of the syllabus; *State v. Mitchell* (1989), 60 Ohio App.3d 106, 108, 574 N.E.2d 573 [576]. However, when the evidence submitted by the defendant is insufficient as a matter of law to support the defense, the trial court commits no error in failing to submit the issue to the jury. See *State v. Shane* (1992), 63 Ohio St.3d 630, 631, 590 N.E.2d 272 [273–274]; *Melchior, supra,* at 20–21 [10 O.O.3d at 11–12, 381 N.E.2d at 199–200]."[2]

■ Requested instructions must be "specifically applicable to facts in issue."[3] Jury instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as factfinder must be given.[4]

■ The state argues that because the evidence did not warrant a self-defense instruction in the first instance, a transferred-intent self-defense instruction was unwarranted. We agree.

■ A claim of self-defense requires evidence that the defendant was not at fault in creating the situation giving rise to the affray, that he had a *bona fide* belief that he was in imminent danger of death or great bodily harm and that his only means of escape was by the use of force, and that he did not violate any duty to retreat or avoid the danger.[5]

First, the evidence indicated that Robinson was at fault in creating the situation that led to the affray. The record indicates that Robinson intentionally assumed a primary role in the criminal enterprise that was operating out of the residence. His duties included the protection of the enterprise's inventory by means of a firearm. Thus, his intended role contemplated just such an affray as occurred in the case at bar; if intruders were to threaten the inventory, he was to use any means, including deadly force, to ward off the attack. Thus, the protection of his own person was incidental to his use of deadly force. The evidence indicated that such force would have been used in any event to protect the enterprise's cache of drugs.

■ Although the evidence indicated that intruders did in fact enter the residence and that Robinson was therefore not solely at fault in the events that led to the affray, his fault was such that he should not have been given the benefit

---

2. *State v. Foster* (Apr. 2, 1997), Hamilton App. No. C–960278, unreported, 1997 WL 162823.

3. *State v. Guster* (1981), 66 Ohio St.2d 266, 20 O.O.3d 249, 421 N.E.2d 157.

4. *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640, paragraph two of the syllabus.

5. *State v. Kershaw* (1999), 132 Ohio App.3d 243, 724 N.E.2d 1176, citing *State v. Jackson* (1986), 22 Ohio St.3d 281, 283, 22 OBR 452, 453–454, 490 N.E.2d 893, 896.

of the self-defense instruction. This court cannot sanction a rule of law whereby a person may arm himself with the specific purpose to protect a criminal enterprise and then claim self-defense when that enterprise is threatened. Thus, we hold that Robinson's fault in the case at bar required the rejection of the self-defense instruction.

■ Second, Robinson failed to present sufficient evidence to indicate that he reasonably believed he was in imminent danger of death. The reasonableness of Robinson's belief that he faced imminent danger must be determined under a combined subjective and objective test.[6] The objective part of the test requires consideration of "whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack," the defendant reasonably believed he was in imminent danger.[7] The subjective part requires consideration of whether the defendant had an honest belief that he was in imminent danger.

■ In the case at bar, the intruders had fled at the time that Robinson fired the shots, and Robinson did nothing to discern the identity of the person who was attempting to open the door to the bedroom. Robinson contends that chaos reigned in the residence as a result of the intrusion and suggests that there was no time for reflection or investigation. However, in determining whether the second element of self-defense has been established, we must examine whether there existed some factual basis for the belief that the person who was fatally injured was in fact the aggressor. Here, no such basis is to be found. The record establishes Robinson's awareness that persons other than the intruders were present in the residence. His failure to present any evidence of an attempt to determine who was entering the room must defeat his claim that he reasonably feared imminent danger.

To hold otherwise would be to permit any person in a dangerous situation to fire blindly in the hope that the person he strikes is in fact an aggressor and therefore his intended target. In addition to being an invitation to mayhem, such a rule would not be compatible with the requirement that the use of deadly force be based upon a *reasonable* belief that danger is imminent. Accordingly, we agree with the state that Robinson failed to produce sufficient evidence as to the second element of self-defense.

Having concluded that the instruction on self-defense was contrary to the evidence, we must also conclude that Robinson was not prejudiced by the refusal of the trial court to instruct the jury as to transferred-intent self-defense.

6. *State v. Thomas* (1997), 77 Ohio St.3d 323, 330, 673 N.E.2d 1339, 1345.

7. *State v. Thomas, supra,* at 330–331, 673 N.E.2d at 1345.

Robinson was given the benefit of an instruction to which he was not properly entitled. The trial court's rejection of an instruction that would have expanded the defense did not constitute reversible error. Robinson's first assignment of error is therefore overruled.

## II. Sufficiency of the Evidence

In his second assignment of error, Robinson claims that the evidence presented by the state was insufficient to support his murder conviction. He specifically challenges the sufficiency of the evidence presented to prove that he acted purposely. The gist of his argument seems to be that because Robinson acted in self-defense, he lacked the intent to kill Jackson. We are not persuaded by this argument.

██ Our function, in reviewing Robinson's sufficiency-of-the-evidence claim, is to examine the evidence presented at trial and to determine whether that evidence, viewed in a light most favorable to the state, would have convinced any rational trier of fact that Robinson was guilty beyond a reasonable doubt.[8] Robinson's conviction of murder required the state to show that he purposely caused another's death.[9] A person is deemed to act "purposely" when "it is his specific intention to cause a certain result."[10] In this case, the state had to show that Robinson had the specific intention to cause the death of another.

██ Robinson did not testify at trial so the jury had no direct evidence of his intent. Direct evidence, however, is not necessary to prove intent. Intent can also be deduced from "all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound."[11] "[A] firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death."[12] Furthermore, "[a] person is presumed to intend the natural, reasonable and probable consequences of his acts."[13]

---

8. See *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

9. R.C. 2903.02(A).

10. R.C. 2901.22(A).

11. *State v. Robinson* (1954), 161 Ohio St. 213, 53 O.O. 96, 96–97, 118 N.E.2d 517, 518, paragraph five of the syllabus.

12. *State v. Widner* (1982), 69 Ohio St.2d 267, 270, 23 O.O.3d 265, 266–267, 431 N.E.2d 1025, 1028.

13. *State v. Gordon* (Aug. 22, 1997), Hamilton App. No. C–960624, unreported, 1997 WL 602871, citing *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 80–81, 381 N.E.2d 637, 640.

The circumstantial evidence provided to the jury was that, within seconds of hearing gunshots and yelling, Jackson attempted to gain entrance to the locked bedroom where Robinson was located. Robinson fired three shots through the door, killing Jackson with one of the bullets. The act of firing three shots through the door, knowing someone was standing on the other side, provided a strong indication that Robinson intended to kill someone.[14] "Given the close range and caliber of the firearm, a trier of fact could construe the intention to shoot as proof of an intention to kill."[15]

In this situation, Robinson obviously did not intend to kill Jackson specifically, so the "purposely" element was not satisfied directly. Nonetheless, because the evidence showed that Robinson's intention to kill was directed toward whoever was on the other side of the door, the doctrine of transferred intent satisfied the element of "purposely." Under this doctrine, "where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting to harm is held criminally liable as if he both intended to harm and did harm the same person."[16] Based on the record and the applicable standard of review, we conclude that Robinson's conviction was sustained by sufficient evidence.

Furthermore, Robinson's self-defense claim did not negate the evidence that the state offered as proof of Robinson's intent. Self-defense is an affirmative defense that a defendant claims justifies his conduct and "exempts him from liability even if it is conceded that the facts claimed by the prosecution are true."[17] We overrule Robinson's second assignment of error.

### III. Weight of the Evidence

In his third assignment of error, Robinson raises a weight-of-the-evidence challenge. Specifically, he contends that because he had established self-defense by a preponderance of the evidence, the conviction was improper.

To reverse a conviction as against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences,

**14.** See *State v. Smith* (1993), 89 Ohio App.3d 497, 501, 624 N.E.2d 1114, 1116.

**15.** *Id.*

**16.** *State v. Mullins* (1992), 76 Ohio App.3d 633, 637, 602 N.E.2d 769, 771. See *State v. Richey* (1992), 64 Ohio St.3d 353, 595 N.E.2d 915.

**17.** *State v. Poole* (1973), 33 Ohio St.2d 18, 19, 62 O.O.2d 340, 340, 294 N.E.2d 888, 889, quoting Anderson, 1 Wharton's Criminal Evidence (12 Ed.) 54–55, Section 19.

consider witness credibility, and determine that, in resolving the conflicts in the evidence, the jury lost its way and created a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered.[18]  As we stated in response to the first assignment of error, the evidence did not even support a jury instruction concerning Robinson's claim of self-defense.  Thus, we cannot say that the jury lost its way in rejecting that claim.  Accordingly, the third assignment of error is overruled.

Having overruled each of Robinson's assignments of error, we hereby affirm the judgment of the trial court.

*Judgment affirmed.*

SHANNON, J., concurs.

PAINTER, J., concurs in part and dissents in part.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.

PAINTER, Judge, concurring in part and dissenting in part.

Because I believe that the trial judge was correct in giving the self-defense instruction, and thus came closer to the mark than my colleagues, I dissent.

This case places before this court a unique factual situation that gives rise to the issue of whether a criminal defendant is entitled to a transferred-intent self-defense jury instruction.  The legal doctrine of transferred intent usually serves as a sword for the prosecution, not as a shield for the defense.  I would hold that it works both ways and that the evidence in this case warranted not only a jury instruction on self-defense, but also an instruction on transferred-intent self-defense under *State v. Clifton.*[19]  Thus, while I agree with the majority's disposition of Robinson's second and third assignments of error, I dissent from the majority's resolution of his first assignment.

Our duty is to determine whether the evidence is such that an instruction on transferred-intent self-defense was pertinent, legally correct, and not covered by any other instruction.  If we answer any of these in the negative, we review the trial court's refusal to give the requested instruction under an abuse-of-discretion standard.[20]  If we determine that the requested instruction was pertinent, legally

---

18.  *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720–721.

19.  (1972), 32 Ohio App.2d 284, 61 O.O.2d 348, 290 N.E.2d 921.

20.  See *State v. Guster* (1981), 66 Ohio St.2d 266, 20 O.O.3d 249, 421 N.E.2d 157.

correct, and not otherwise covered, we review the trial court's refusal to provide the instruction as a question of law.[21] An instruction is pertinent if it is applicable to the evidence presented in the case.[22] For the refusal to give requested jury instructions to be prejudicial, the failure must impair the theory of the case of the party making the request.[23]

## I. Self–Defense

The majority concludes that because a self-defense instruction was not pertinent, Robinson was not entitled to a transferred-intent self-defense instruction. Its conclusion is premised on its assertion that the evidence failed to demonstrate two of the prongs necessary to demonstrate self-defense: (1) that Robinson was not at fault in creating the situation giving rise to the affray, and (2) that he had a *bona fide* belief that he was in imminent danger of death or great bodily harm.[24] I believe, as did the trial court, that the evidence sufficiently demonstrates entitlement to a self-defense instruction.

### A. Involvement in Criminal Activity Does Not Give Rise to an Affray

The majority holds that engagement in a potentially dangerous criminal enterprise that requires contemplation of protection constitutes the "creation of a situation giving rise to an affray." Not surprisingly, they cite no case law to support this conclusion. The new rule of law announced is simply made up today. Case law, up to today, provides that the right to use self-defense is lost when one claiming the defense is the aggressor or instigator in an altercation, not when one carries a weapon in contemplation of potential danger. It is the *act* of being an aggressor or escalating a confrontation that creates a situation giving rise to an affray under established case law,[25] not the *contemplation* of a potential affray.

At first glance, there is some logic to the majority's new rule of law, especially in this one unusual case. But the law must apply in nondrug as well as in drug

---

**21.** See *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828; *Cincinnati v. Epperson* (1969), 20 Ohio St.2d 59, 49 O.O.2d 342, 253 N.E.2d 785, overruled on other grounds by *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965.

**22.** *State v. Boulabeiz* (1994), 92 Ohio App.3d 238, 634 N.E.2d 700.

**23.** *Curran v. Chrysler Motors Corp.* (June 26, 1996), Hamilton App. No. C–950340, unreported, 1996 WL 348023; *Alford v. Nelson* (Oct. 12, 1994), Jackson App. No. 93CA720, unreported.

**24.** See *State v. Kershaw* (1999), 132 Ohio App.3d 243, 724 N.E.2d 1176, citing *State v. Jackson* (1986), 22 Ohio St.3d 281, 283, 22 OBR 452, 453–454, 490 N.E.2d 893, 896.

**25.** Cf. *State v. Kershaw, supra*; *State v. Cole* (Jan. 22, 1997), Hamilton App. No. C–950900, unreported, 1997 WL 22659; *State v. Tarrance* (Nov. 27, 1996), Hamilton App. No. C–960145, unreported, 1996 WL 682178; *State v. Williams* (1996), 115 Ohio App.3d 24, 684 N.E.2d 358.

cases. And it must apply in nonfirearm as well as in firearm cases. All too often, the stroke of the judicial pen used to create new law becomes as wide as a brush.

The practical consequence of the majority's theory is that if someone is involved in a criminal activity, that person forfeits the right of self-defense. The consequences of this brush stroke are wide indeed. Such a rule would preclude a purchaser of drugs from asserting self-defense if the seller attacked him or her, and foreclose a prostitute from asserting the defense if the case involved a brutal attack by a customer. Likewise, an investment banker who was embezzling funds could not assert a self-defense claim if attacked by an irate client; nor could a mechanic defend himself or herself if attacked by a customer while rolling back an odometer.

I am unwilling to hold that a person involved in a criminal activity in which he arms himself against potential attackers is, as a matter of law, precluded from using self-defense against an aggressor. Further, this novel theory is not supported by any precedent that I can discover.

## B. One May Have a Reasonable, Albeit Mistaken, Belief in Imminent Danger

The majority next concludes that the evidence fails to demonstrate a factual basis for the belief that Robinson was in imminent danger, in part because Robinson failed to discern who was on the other side of the bedroom door. Once again, under the specific facts of this case, I believe that Robinson's failure to open the door before shooting does not, as a matter of law, defeat the reasonableness of his fear of imminent harm. Evidence demonstrated that House yelled, "They have guns," and five shots were immediately fired into the apartment while Robinson was behind the locked bedroom door. The room was in chaos. Bullets were flying and Jackson was screaming. The only delay between the shots being fired into the apartment by the would-be robbers and the three shots through the bedroom door was the short time it took to shut the front door and for Jackson to run to the bedroom door. After the three shots, Robinson opened the door, with the gun in his hand, shaking, scared, and "in a state of shock." He asked others in the apartment to call 911 and handed Gibson his cellular telephone to do so.

The reasonableness of Robinson's belief "depended in part on the information he possessed, even if he was mistaken." [26] In appraising the situation, one may, under the circumstances, be reasonable though mistaken, since, as Mr. Justice Holmes has put it, "Detached reflection cannot be demanded in the presence of

---

26. *State v. Thomas* (Oct. 8, 1985), Cuyahoga App. No. 49586, unreported, 1985 WL 17501, citing *Marts v. State* (1875), 26 Ohio St. 162, paragraph two of the syllabus.

an uplifted knife." [27]   I agree with the trial court that, in this situation, Robinson could have reasonably believed that he was in imminent danger of death.

Moreover, the issue of the reasonableness of the belief is a jury question, as the trial court recognized.[28]   The evidence on the reasonableness of Robinson's belief, combined with the other elements of the affirmative defense of self-defense, only had to be such that, if believed, it would raise a question in the minds of reasonable men concerning its existence.[29]   Further, by deciding the reasonableness of Robinson's belief of imminent danger in the court of appeals, the majority both reverses the trial court's finding on this issue and usurps the role of the jury.

### C.   Courts Have Concluded Self–Defense Is Applicable Under Similar Facts.

Though like cases are understandably sparse, other courts have agreed under similar facts that self-defense was warranted.   In *Minix v. Kentucky*,[30] a man shot at the lock on a basement door of a restaurant/bar because he wanted to know who was in the room behind the door.   After the man emptied his gun through the door, the defendant, who was sitting on the opposite side, in line with the shots, fired back through the door as soon as he could draw his pistol and killed someone else standing on the other side.   The court concluded that such facts created a clear case of self-defense.   Someone was firing through the door, the defendant was within the range of the bullets, there was no time for prolonged reflection, and the defendant could not tell whether the gunfire had ceased.   The defendant fired at the shooter and killed someone else.   The court explained that if the shooting of the gunman would have been justified, or excusable as self-defense, the shooting of a third person by a bullet intended for the gunman was also excusable.

In *Ringer v. State*,[31] some men believed a "turkey shoot" was to take place at a local general store.   Upon arriving, though, they found that the owner had no turkey and decided to convert the adventure into a "chicken shoot."   After shooting the available chickens and consuming the available alcohol, two of the

---

**27.**  1 LaFave & Scott, Substantive Criminal Law (1986) 654, Section 5.7(c), quoting *Brown v. United States* (1921), 256 U.S. 335, 343, 41 S.Ct. 501, 502, 65 L.Ed. 961, 963.

**28.**  See *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970;  *State v. Perez* (1991), 72 Ohio App.3d 468, 594 N.E.2d 1041;  *State v. Lucaj* (May 17, 1990), Cuyahoga App. No. 56933, unreported, 1990 WL 66464.

**29.**  *State v. Melchior* (1978), 56 Ohio St.2d 15, 10 O.O.3d 8, 381 N.E.2d 195, paragraph one of the syllabus.

**30.**  *Minix v. Kentucky* (1937), 266 Ky. 801, 100 S.W.2d 825.

**31.**  *Ringer v. State* (1905), 74 Ark. 262, 85 S.W. 410.

men got into a fracas. The defendant, who had been assaulted and twice wounded, fled into his store. Believing his assailant was about to enter the door, the defendant fired his gun toward the door and killed his assailant's father, who had started out the door. The trial court refused to provide an instruction on involuntary manslaughter. The appellate court reversed, holding that the issue of involuntary manslaughter should have been presented to the jury. It explained, "The law does not hold it unlawful or criminal for a man to shoot in necessary self-defense; and if the defendant believed [his assailant] was still following up the attack and it was necessary to shoot in order to protect himself, then the intention with which the act was done was not criminal, for, as before stated, it is not unlawful to intend to do an act which one honestly believes to be necessary to protect himself, when the circumstances justify such belief." [32]

In *Carbo, Inc. v. Lowe*,[33] three men approached the counter of a liquor store. Two of the men wore masks and carried guns. They flanked the third man, who had no mask or gun and was wearing a Gary Public Transportation jacket. The two men fired a volley of shots, and the defendant, an employee, returned the fire. The man wearing the jacket jumped over the counter, and the defendant shot him. He lunged forward, and the defendant shot him again, killing him. Determining that the defendant was entitled to believe that he was being attacked pursuant to a robbery attempt, the court concluded that he was "justified in killing in self-defense," and his actions were "excused just as they would have been had he fired at one of the actual robbers and the bullet had struck [the victim] by accident." [34]

## II. TRANSFERRED INTENT

Having concluded that the trial court correctly determined that a self-defense instruction was warranted under the facts of this case, I also believe that the instruction on transferred-intent self-defense under *State v. Clifton, supra,* should have been provided to the jury. Crucial to this analysis is an explanation of the doctrine of transferred intent from which transferred self-defense flows.

In this case, the state had to prove that Robinson purposely caused Jackson's death. Because there was no evidence that Robinson intended specifically to kill Jackson, the trial court provided the jury with an instruction on transferred intent. The doctrine of transferred intent allows the state to prove the culpable mental state of a defendant where an act directed toward an intended victim

---

32.  *Id.* at 262, 85 S.W. at 412.

33.  *Carbo, Inc. v. Lowe* (Ind.App.1988), 521 N.E.2d 977.

34.  *Id.* at 981.

instead harms someone else.[35] Thus, in this case the state, relying on transferred intent, did not have to show Robinson intended to kill Jackson, only that he intended to cause someone's death. Obviously, transferred intent generally works for the benefit of the state.

### III. Transferred–Intent Self–Defense

The defense of transferred-intent self-defense is based on analogous reasoning. In *State v. Clifton, supra*, this court held, in paragraph one of the syllabus:

"The accidental killing of an innocent party by one acting in self-defense against an attack by another is not a crime and the failure of a court to so instruct a jury deliberating the guilt of one accused of the manslaughter of such a party is error."

The rationale of this holding "rest[s] upon the common law theory of 'transferred intent' which, in its principal application, establishes that one's criminal intent follows the corresponding criminal act to its unintended consequences. As the noted cases have held, the reasoning applies equally to carry the *lack of criminal intent* to the unintended consequences and thus preclude criminal responsibility."[36] (Emphasis *sic*.)

In other words, if Robinson had been justified in killing the unknown robber (the person he intended to kill), his action in killing Robinson would be excusable. Transferred intent usually favors the prosecution; transferred-intent self-defense obviously favors the defendant.

This case is somewhat of an anomaly. Unlike the victim's death in *State v. Clifton*, Jackson's death was not by a stray bullet. Robinson was behind a closed door when House yelled that they were being robbed. Within seconds, bullets were fired. Jackson screamed. She hit the bedroom door. Robinson fired at the person on the other side of the door, not knowing it was Jackson.

I believe, in looking at the specific facts of this case, that an instruction on transferred-intent self-defense was as warranted as it would have been had Robinson fired at the perceived robber and the bullet struck Jackson by accident.[37] There was no evidence tending to prove that Robinson apprehended

---

**35.** See *State v. Mullins* (1992), 76 Ohio App.3d 633, 602 N.E.2d 769.

**36.** *State v. Mathews* (1979), 91 Cal.App.3d 1018, 1023, 154 Cal.Rptr. 628, 631, relying on *State v. Clifton, supra*. See, *e.g.*, Annotation (1974), 55 A.L.R.3d 620.

**37.** Cf. *Carbo, Inc. v. Lowe, supra; Minix v. Commonwealth, supra*.

or had reason to apprehend danger specifically from Jackson. Instead, the evidence demonstrated Robinson was entitled to believe his life was threatened by·whoever was on the other side of the bedroom door.[38] Thus, Robinson's proposed instruction was substantially correct.

Further, while the trial court provided a general self-defense instruction, that instruction failed to inform the jury that an act of self-defense as to the robbers was also self-defense as to Jackson. The animus to sustain the murder conviction rested solely on the doctrine of transferred intent. Robinson clearly had no idea his cohort was on the other side of the door and had, within seconds before Jackson hit the door, heard screams and shooting. The transferred-intent self-defense instruction was necessary for the jury to evaluate Robinson's claim of self-defense as it applied to Jackson. Without it, the jury was cast at sea with half a compass. Without the requested instruction, the jury easily could have believed that Robinson's intent to kill the robbers could be transferred to prove the intent to kill Jackson, but that he was entitled to defend himself only against the robbers, and that because the robbers were not on the other side of the door, Robinson had no right to defend himself. Because the instruction on transferred-intent self-defense was pertinent, legally correct, and not otherwise covered, I conclude that the trial court improperly refused to provide the instruction. I also conclude that its absence was prejudicial under the specific, uncontroverted facts of this case.

I would sustain Robinson's first assignment of error, reverse the conviction for murder, and remand to the trial court with instructions to provide, in a new trial, the jury with the transferred-intent self-defense instruction. Though some might find that result unfortunate, and of course a second jury might reach the same result as did the first, I much prefer that course to derailing the long-settled law of self-defense.

---

**38.** Accord *Minix v. Commonwealth, supra.*